## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| KIMBERLY SOLOMON-WALLACE, DEREK R. MILEY, and KENYA GREEN on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GARDAWORLD CASH SERVICES, INC. d/b/a GARDAWORLD CASH<br><br>Defendant. | Civil Action No.:<br><br><br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs Kimberly Solomon-Wallace, Derek R. Miley, and Kenya Green, individually and on behalf of the Class defined below of similarly situated persons, allege the following against GardaWorld Cash Services, Inc. d/b/a/ GardaWorld Cash. ("GardaWorld" or "Defendant") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

## <u>NATURE OF THE ACTION</u>

1. It is both unfair and unlawful for companies like GardaWorld to impose discriminatory and punitive health insurance surcharges on employees who use tobacco products. This lawsuit challenges Defendant's unlawful practice of charging a "tobacco surcharge" without complying with the regulatory requirements under the Employee Retirement Income Security Act of 1974 ("ERISA") and the implementing regulations. ERISA permits health-contingent wellness programs only if participants are offered a clearly disclosed, reasonable alternative standard that allows *every* similarly situated individual to obtain "the same, full reward," including retroactive

refunds for surcharges paid while completing that alternative. *See* 29 U.S.C. § 1182(b)(2)(B); 42 U.S.C. § 300gg-4(j)(3)(D). A single defect, whether in design, timing, or disclosure, can disqualify a program from ERISA's statutory safe harbor, rendering the wellness program noncompliant and the surcharge discriminatory

2.       GardaWorld's wellness program fails even the most basic disclosure requirements under ERISA. While GardaWorld offers a wellness program under the GardaWorld Cash Services, Inc. Health and Welfare Benefit Plan (the "Plan"), the Summary Plan Description ("SPD") makes no mention whatsoever of any tobacco or vaccine surcharge. The surcharges appear in GardaWorld's Benefits Enrollment Guidebooks, but those materials omit crucial information required by federal law. First, with regard to the tobacco surcharge, the Guidebooks state that an employee "must complete" the cessation program and "then notify" HR "to eliminate the surcharge," giving the impression that removal of the surcharge occurs only *prospectively*, without retroactive relief, as required under ERISA. No alternative whatsoever is offered for avoiding the vaccine surcharge. Further, the Guidebooks do not mention that a physician's recommendation will be accommodated in developing an alternative standard, as required. ERISA's exception for wellness programs is narrow for a reason, and GardaWorld's failure to meet the necessary criteria disqualifies its surcharges from that protection, making it a straightforward violation of federal law

3.       Tobacco surcharges and, to a lesser extent, vaccine surcharges have become more prevalent in recent years but to be lawful plans must make available a *compliant* "wellness programs" that provides employees with avenues to avoid the surcharges. Making a compliant wellness program available means employers **must** adhere to strict rules set forth by ERISA and the implementing regulations established by the Departments of Labor, Health and Human

Services, and the Treasury (collectively, the "Departments") over ten years ago in 2014. ERISA imbues the Departments with the authority to promulgate regulations interpreting ERISA § 702, 29 U.S.C. § 1182, the statute's non-discrimination provision. Accordingly, the Departments have developed a regulatory framework that "must be satisfied" to qualify for the statutory exception or safe-harbor. Employers can only invoke this safe harbor if they can demonstrate full compliance with all the requirements. Moreover, while courts are no longer required to defer to an agency's interpretation of an ambiguous *statute* under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), courts must still defer to an agency's interpretation of its own *regulations*, if that interpretation is neither plainly erroneous nor inconsistent with the regulatory framework. *Auer v. Robbins*, 519 U.S. 452 (1997); *Kisor v. Wilkie*, 588 U.S. 558 (2019).

4.      ERISA's strict regulatory requirements are meant to ensure that wellness programs actually promote health and preclude discrimination, instead of wellness programs that are "subterfuge[s] for discriminating based on a health factor."[1] The Final Regulations establish that for plans to be compliant, they must provide a clearly defined, reasonable alternative standard that allows participants to obtain the "full reward," including retroactive reimbursement of surcharges paid while completing the alternative standard. *See id.*, 33159–63. First and foremost, a wellness program must be genuinely designed to improve health or prevent disease, rather than functioning as an improper penalty imposed on certain participants under the guise of a health initiative. Defendant's Plan fails to clearly establish a *reasonable* alternative standard that properly informs employees of their right to avoid the surcharges, imposes a roughly $100 monthly surcharge on all nicotine users, along with a $100 vaccine surcharge, but does not offer compliant wellness

---

[1] *Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg. 33158, 33163 (June 3, 2013) (hereinafter the "**Final Regulations**").

programs to participants allowing them to avoid these surcharges and obtain the "full reward."

Also, Defendant does not inform participants of their rights regarding how to avoid the surcharges,

making the surcharges discriminatory and unlawful.

5. The need for regulatory safeguards surrounding these types of wellness programs

is underscored by studies showing little evidence that wellness programs effectively reduce

healthcare costs through health improvement. Instead, the savings employers claim often result in

cost-shifting onto employees with higher health risks, disproportionately burdening low-income

and vulnerable workers who end up subsidizing their healthier colleagues.[2] The regulatory

safeguards seek to prevent wellness programs from being misused as thinly veiled revenue-

generating schemes at the expense of employees who are least able to afford the additional costs

by shifting the burden to plan sponsors to demonstrate compliance once a participant alleges

discriminatory surcharges. The goal is to ensure that wellness programs operate equitably and in a

non-discriminatory manner, and to promote genuine health improvements.

6. Outcome-based programs,[3] such as being tobacco-free, completing a smoking

cessation program, or being vaccinated, must offer a clearly defined "*reasonable* alternative

standard," which is an alternative way for "all similarly situated individuals" to obtain the reward

---

[2] Horwitz, J. R., Kelly, B. D., & DiNardo, J. E. (2013). *Wellness incentives in the workplace: Cost savings through cost shifting to unhealthy workers*. Health Affairs, 32(3), 468–476, 474 ("wellness programs may undermine laws meant to prevent discrimination on the basis of health status. Since racial minorities and people with low socioeconomic status are more likely than others to have more health risks, they are also more likely to be adversely affected by cost shifting"); *see also* Dorilas, E., Hill, S. C., & Pesko, M. F. (2022). *Tobacco surcharges associated with reduced ACA marketplace enrollment*. Health Affairs, 41(3), Abstract (finding that tobacco surcharges are significant barriers to affordable health insurance).

[3] "An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward." 29 C.F.R. § 2590.702(f)(1)(v).

(or avoid a penalty) if they are unable to meet the initial wellness program standard (i.e., being tobacco-free). Critically, ERISA's implementing regulations require that "the *same*, *full reward*" must be provided to individuals who complete the alternative standard, regardless of when they do so during the plan year.[4] The Department of Labor ("DOL") has made clear that participants should not be forced to rush through the program under the threat of continued surcharges and that every individual participating in the program must receive the same reward as provided to non-smokers. *Id.* The Departments made this requirement clear when they stated it is "[t]he intention of the Departments . . . that, regardless of the type of wellness program, ***every individual participating in the program*** should be able to receive ***the full amount of any reward or incentive*** . . . ." *Id.*, 33160 (emphasis added). Defendant violates these requirements by failing to provide a reasonable alternative standard that provides full reimbursement to all employees who satisfy the alternative standard, if available. Defendant's surcharges are discriminatory because the wellness program, if offered at all, do not satisfy all the criteria that must be satisfied for a compliant program. *Id.* As a result, GardaWorld's program cannot qualify for ERISA's anti-discrimination safe harbor.

7. Defendant cannot qualify for the statutory safe harbor for wellness programs because, while it imposes health-based surcharges, GardaWorld fails to operate a compliant wellness program or to provide participants the required disclosures. Both its tobacco and vaccine surcharges fall outside ERISA's narrow exception for health-contingent programs. The regulations

---

[4] *See* Final Regulations, 33163 ("while an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual*** as is provided to individuals who meet the initial standard for that plan year. (For example, if a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.)" (emphasis added)).

implementing 42 U.S.C. § 300gg-4 require that a program satisfy *each* enumerated criterion to avoid being discriminatory. This is a strict standard, not a flexible one: unless the employer meets all five criteria, including offering a reasonable alternative standard and providing proper notice in all plan communications discussing the surcharge, the program is unlawful. GardaWorld's program misses those marks on multiple fronts.

8.      The core deficiency of GardaWorld's tobacco-use program is that it does not make the "full reward" available to all participants who complete the alternative standard. Participants are told that if they complete the program, then that surcharges stop at that point. In other words, the tobacco surcharge will be removed on a *go-forward* basis; there is no refund or retroactive reimbursement for months in which participants already paid the surcharge.  The Guidebooks makes clear that "[t]here will be ***no refunds of any surcharges that have been assessed***." By limiting relief to prospective removal, Defendant denies participants who complete the cessation program mid-year the "same, full reward" required under 42 U.S.C. § 300gg-4(j)(3)(D) and 45 C.F.R. § 146.121 (f)(4)(iv). The Departments have explicitly rejected such timing-based restrictions as inconsistent with the full reward rule. Defendant's design is therefore *per se* non-compliant.

9.      The flaws in GardaWorld's wellness program extend beyond tobacco use. GardaWorld imposes an additional vaccine surcharge, but unlike its tobacco surcharge, there is no reasonable alternative standard offered at all. The Guidebooks make no mention of any waiver process, accommodation, or alternative means of avoiding the surcharge. This omission violates a core premise of the wellness program regulations: that all similarly situated individuals must have a genuine opportunity to earn the full reward. By offering no way to avoid the surcharge other than vaccination, GardaWorld cannot qualify for the safe harbor.

6

10. GardaWorld also fails the notice requirement that applies to *all* health-contingent wellness programs. Federal law requires plans to disclose, "in all plan materials describing the terms of the wellness program," the availability of a reasonable alternative standard, contact information for accessing that standard, and that a participant's personal physician's recommendations will be accommodated. 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v). Neither the SPD nor the Benefit Guide includes that statement. The Guide omits any reference to a reasonable alternative standard, fails to note that a physician's advice will be honored, and gives participants no way to request an accommodation or refund. These notice failures are themselves standalone violations that disqualify Defendant from invoking the regulatory safe harbor. Because GardaWorld cannot meet the mandatory criteria for lawful wellness programs, the surcharges it imposes are unlawful and discriminatory in violation of ERISA and its implementing regulations.

11. This Complaint alleges that Defendant imposes health-based surcharges without making available compliant alternative standards to avoid those surcharges. Defendant bears the burden of proving that their surcharges are lawful by showing that their wellness programs fully complies with *every* requirement under ERISA, including the "full reward" and notice rules. This type of discrimination is permissible only if employers meet ERISA's strict wellness program criteria, which Defendant does not. No amount of *post hoc* justifications can cure this fundamental defect. Defendant's Plan is not a "program[] of health promotion or disease prevention" as required by ERISA but instead an impermissible cost-shifting scheme that unlawfully penalizes employees for their health status

12. Participants like Mr. Miley and Ms. Solomon-Wallace are, in the least, permitted to challenge not only the arbitrary restrictions that Defendant has placed on obtaining the "full

reward," but also the failure of an employer to include critical information about participants' rights in the materials that are shown to them during enrollment. Once a participant alleges that a surcharge violates ERISA's anti-discrimination provisions and alleges facts to support the deficiency in the wellness program, the burden shifts to the employer to demonstrate that its wellness program fully satisfies all the statutory and regulatory criteria, including the obligation to make available the "full reward" and to notify participants of the same. *See Cunningham v. Cornell Univ.*, 145 S. Ct. 1020, 1029 (2025) (reaffirming "that 'the burden of persuasion as to certain elements of a plaintiff 's claim may be shifted to defendants, when such elements can fairly be characterized as affirmative defenses or *exemptions*.'").

13. Plaintiffs are employees and participants in the Plan who paid the unlawful surcharges to maintain health insurance coverage under the Plan. These surcharges imposed an additional financial burden on Plaintiffs and continue to impose such a burden on those similarly situated.

14. Plaintiffs bring this lawsuit individually and on behalf of all similarly situated Plan participants and beneficiaries, seeking to recover these unlawfully charged fees and for plan-wide equitable relief to prevent GardaWorld from continuing to profit from its violations under 29 U.S.C. § 1109. Defendant, as Plan Administrator, is a fiduciary of the Plan who had, and continues to have, a legal obligation to act in the best interests of Plan participants and to comply with federal law. Plaintiffs, on behalf of themselves and the Plan as a whole, seek appropriate equitable relief under 29 U.S.C. § 1132(a)(2) and (a)(3) to address Defendant's ongoing violations of ERISA's anti-discrimination provisions.

**PARTIES**

15.     Plaintiff Kimberly Solomon-Wallace is, and at all times mentioned herein was, an individual citizen of the State of Illinois residing in the County of Cook. Ms. Solomon-Wallace is an employee of GardaWorld who paid the tobacco surcharges associated with the health insurance offered through her employer during her employment.

16.     Plaintiff Derek Miley is, and at all times mentioned herein was, an individual citizen of the State of South Carolina residing in the County of Horry. Mr. Miley is an employee of GardaWorld who paid the tobacco and vaccine surcharges associated with the health insurance offered through his employer during his employment.

17.     Plaintiff Kenya Green is, and at all times mentioned herein was, an individual citizen of the State of Arizona residing in the County of Maricopa. Ms. Green is an employee of GardaWorld who paid the tobacco surcharge associated with the health insurance offered through her employer during her employment.

18.     Plaintiffs are participants in the Plan pursuant to 29 U.S.C. § 1002(7).

19.     Defendant GardaWorld Cash Services, Inc. d/b/a GardaWorld Cash is incorporated in Delaware with its principal place of business at 2000 NW Corporate Blvd, Boca Raton, Florida.

20.     At all times relevant to this lawsuit, Defendant operated one or more health and welfare plans which were available for GardaWorld employees. The Plan GardaWorld Cash Services, Inc. Health and Welfare Benefit Plan is an employee benefit plan subject to the provisions and statutory requirements of ERISA pursuant to 29 U.S.C. § 1003(a). Upon information and belief, the welfare plans have thousands of participants, a sizable portion of whom were charged the unlawful surcharges.

9

## JURISDICTION AND VENUE

21.     The Court has subject matter jurisdiction pursuant to 29 U.S.C. §1132(e)(1) and §28 U.S.C. 1331, as this suit seeks relief under ERISA, a federal statute. It also has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

22.     This Court has personal jurisdiction over Defendant because it conducts substantial business in Illinois and has purposefully availed itself of the privilege of conducting activities in this State. Upon information and belief, Defendant has employees who reside and work in this District, and it implements aspects of the Plan, including through payroll deductions for the surcharges at issue. Defendant's acts and omissions with respect to the administration of the tobacco and vaccine surcharges were directed to, and had effects in, this District, giving rise to the claims alleged herein.

23.     Venue is proper in this District under 2 U.S.C. 1132§ (e)(2) because this is a District where breaches of ERISA occurred, and where Defendant may be found. GardaWorld employs numerous participants in the Plan within this District and applied the challenged surcharges to Plan participants residing in this District.

## FACTUAL BACKGROUND

I.     **DEFENDANT'S SURCHARGES VIOLATE ERISA'S ANTI-DISCRIMINATION RULE**

   **A. Statutory and Regulatory Requirements**

24.     To expand access to affordable health insurance coverage, the Affordable Care Act ("ACA") amended ERISA to prohibit any health insurer or medical plan from discriminating

against participants in providing coverage or charging premiums based on a "health-related factor," including tobacco use. Under this rule, a plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution that is greater than such premium or contribution for a similarly situated individual enrolled in the plan based on any health-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." ERISA § 702(b)(1), 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1).

25.     The statute permits group health plans to "establish[] premium discounts or rebates . . . in return for adherence to *programs of health promotion and disease prevention*" (29 U.S.C. § 1182(b)(2)(B) (emphases added)); however, these "wellness programs"—to qualify for this statutory safe-harbor exception—must strictly adhere to the mandated regulatory requirements.

26.     Under ERISA § 505, 29 U.S.C. § 1135, Congress granted the Department of Labor the authority to issue regulations, including the power to establish regulations prohibiting discrimination against participants and beneficiaries based on their health status under ERISA § 702, 29 U.S.C. § 1182. This authority empowers the Secretary of Labor (the "Secretary") to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of" Title I of ERISA. (29 U.S.C. § 1135). Furthermore, ERISA § 734, 29 U.S.C. § 1191c, explicitly reinforces the Secretary's authority to issue regulations concerning group health plan requirements, which grants the power to "promulgate such regulations as may be necessary or appropriate to carry out the provisions" of ERISA Title I, Part 7. 29 U.S.C. § 1191c.

27.     Exercising this delegated authority, in 2006, the Secretary issued regulations through the notice-and-comment rulemaking process outlining the criteria that a wellness program

11

must meet to qualify for the premium non-discrimination exception under ERISA § 702(b). *See* Final Regulations, 33158–59. Following the amendments by the ACA and Public Health Service Acts, in 2010, the Departments published proposed regulations in November 2012 to "amend the 2006 regulations regarding nondiscriminatory wellness programs." *Id.*, 33159. These regulations (i.e., the Final Regulations) were approved and signed in 2013 to be effective January 1, 2014. *Id.*, 33158.

28. The Final Regulations specify that health promotion or disease prevention programs, such as outcome-based wellness initiatives (i.e., smoking cessation programs), must meet detailed requirements to qualify for the statutory safe harbor. As the Departments explained, these criteria "***must be satisfied*** in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status." *Id.*, 33163. "That is," the Departments explained, "these rules set forth criteria for an ***affirmative defense*** that can be used by plans and issuers in response to a claim that the plan or issuer discriminated" against participants. *Id.* (emphasis added). That means once a participant alleges a discriminatory surcharge along with facts showing that the alternative standard offered to them is deficient, the burden then shifts to the employer to prove that the wellness program satisfies *all* the necessary criteria.

29. The criteria in the Final Regulations are not optional. They serve as the only lawful pathway for plans to impose health-based premium differentials by ensuring that wellness programs do not arbitrarily penalize participants and they prevent employers from using surcharges as a revenue-generating mechanism rather than a genuine tool for health promotion. If a wellness program fails to meet even one of these stringent requirements, the program is noncompliant and the employer cannot benefit from the statutory carve-out. *See* § 2590.702(f)(4)

12

(describing the "[r]equirements for outcome-based wellness programs," stating that a program "does not violate the provisions of this section *only if __all__ of the [] requirements are satisfied*.").

### B. Regulatory Criteria

30.     To comply with ERISA and avoid unlawful discriminatory surcharges, outcome-based wellness programs must meet the following five (5) criteria:

(a) Frequency of opportunity to qualify: Participants must be given at least one chance annually to qualify for the reward associated with the program to ensure ongoing accessibility and fairness. 29 C.F.R. § 2590.702(f)(4)(i).

(b) Size of reward: penalties or rewards cannot exceed 50% of the cost of employee-only coverage. § 2590.702(f)(4)(ii)

(c) Reasonable design: programs must be "reasonably designed" to promote health and cannot be "a subterfuge for discriminating based on a health factor." This determination is based on all the relevant facts and circumstances. "To ensure that an outcome-based wellness program is reasonably designed to improve health and does not act as a subterfuge for underwriting or reducing benefits based on a health factor, a reasonable alternative standard to qualify for the reward must be provided to any individual who does not meet the initial standard based on a measurement, test, or screening. . . ." § 2590.702(f)(4)(iii)).

(d) Uniform availability and reasonable alternative standards: "The full reward under the outcome-based wellness program must be available to all similarly situated individuals." § 2590.702(f)(4)(iv).

(e) Notice of availability of reasonable alternative standard: notice must include (a) instructions on how to access the reasonable alternative standard; (b) contact

information for inquiries about the alternative standard; and (c) an explicit statement that participants' personal physician's recommendations will be accommodated. *See* § 2590.702(f)(4)(v).

31. The Departments provided valuable insight into each of the criteria, reflecting their intent to operationalize the statute's protections in a manner that both promotes health and prevents discriminatory practices under ERISA.

32. Regarding the first criteria, "the once-per-year requirement was included as a bright-line standard for determining the minimum frequency that is consistent with a reasonable design for promoting good health or preventing disease." Final Regulations, 33162. The once-per-year requirement ensures that participants have a meaningful opportunity to participate in a reasonable alternative standard.

33. A key requirement of the fourth criterion for outcome-based programs is that the "full reward" must be available to "all similarly situated individuals[,]" regardless of when they meet the reasonable alternative standard during the plan year. *See* Final Regulations, 33165. Critically, the Departments clearly state that it is "[t]he intention of the Departments . . . that, regardless of the type of wellness program, ***every individual*** participating in the program should be able to receive the ***full amount of any reward or incentive*. . . .**" *Id.* (emphases added). While plans have flexibility in determining the manner in which they provide the "full reward," providing the "full reward" to every participant is ***mandatory***, regardless of when the participant satisfies the alternative standard. The Departments have made this clear:

> While an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year***. (For example, if a calendar year plan offers a . . . premium discount and an individual . . . satisfies that alternative on April 1, the plan or issuer must provide

14

the premium discounts for January, February, and March to that individual.) Plans and issuers have flexibility to determine ***how*** to provide the portion of the reward corresponding to the period before an alternative was satisfied (e.g., payment for the retroactive period or pro rata over the remainder of the year) ***as long as . . . the individual receives the full amount of the reward***.

Final Regulations, 33163 (emphases added).

34.     The Final Regulations provide an example of a non-compliant plan that imposes a tobacco use surcharge but does not facilitate the participant's enrollment in or participation in a smoking cessation program. *See id.*, Example 8. Instead, the employer advises the participant to find a program, pay for it, and provide a certificate of completion. *Id*. The Final Regulations conclude that the plan is not compliant because it "has not offered a reasonable alternative standard . . .  and the program fails to satisfy the requirements of paragraph (f) of this section." *Id*.; Final Regulations, 33180.

35.     For health contingent wellness programs, the Final Regulations require the notice be disclosed "in *all* plan materials describing the terms of" the program. 42 U.S.C. § 300gg-4(j)(3)(E); 45 C.F.R. § 146.121(f)(4)(v) (emphasis added). Further, the Final Regulations establish that "[f]or ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents . . . if compliance with the wellness program affects premiums . . . under the terms of the plan." Final Regulations, 33166. Plans that charge their participants more and fail to inform participants of their rights in *all* plan materials violate the notice rule.

## II.     DEFENDANT CANNOT AVAIL ITSELF OF ERISA'S SAFE HARBOR

36.     Defendant's tobacco and vaccine surcharges are discriminatory and unlawful because Defendant fails to make available a compliant wellness program that would allow

participants to avoid the entire surcharge. GardaWorld imposes a $100 monthly "tobacco surcharge" ($46.15/biweekly) on participants who use tobacco and are enrolled in the Plan. While the SPD makes no mention of these charges, the Plan's benefit guidebooks indicate that Defendant makes available a smoking cessation program that allows participants to eliminate the tobacco surcharge, on a go-forward basis only.

37.  A 2024 Benefits Enrollment Guidebook describes the tobacco surcharge as an additional $100 per month and that to eliminate the surcharge participants must complete a smoking cessation program. The following shows the Guidebook section discussing the tobacco surcharge:

**Tobacco Use**

If you or any of your dependents use tobacco, you will be subject to a monthly surcharge of $100 in addition to the insurance premium cost for medical coverage. To eliminate this surcharge, you must complete a tobacco cessation journey program through the Aetna website and then notify the GardaWorld Cash Benefits Department of your completion.

The time is now to say goodbye to tobacco. You'd be amazed at how fast your health can improve once you've quit and how much better you can feel after you do. With the right tips and support, you can break the habit. It's easy to find the Tobacco Focus Journey under the "Being Tobacco-Free" section. Select the Tobacco Journey that fits your needs and click to get started.

You can refer to the summary plan description in the "Forms" section of Ceridian/Dayforce for complete medical plan details.

38.  As shown, the Guidebook communicates that participants "must complete a tobacco cessation journey… and then notify GardaWorld … of your completion." There is no indication that completing the program entitles participants to the full years' worth of surcharges, including those paid while enrolled in the program. The Guidebook also fails to provide contact information and fails to inform participants that personal physicians' recommendations will be accommodated, as required under 29 C.F.R. § 2590.702(f)(4)(v). Rather, the Guidebook, twice, makes clear that no refunds will be issued for prior surcharges paid:

**IMPORTANT:** If these affidavits are not completed by December 15, 2023, you will automatically be subject to the monthly $100 Tobacco Use and $100 monthly COVID Vaccination surcharges. There will be no refunds of any surcharges that have been assessed.

16

**It's important to remember that assessed surcharges due to not following the instructions listed above will not be reimbursed!**

Under 42 U.S.C. § 300gg-4(j)(3)(D) and 45 C.F.R. § 146.121(f)(4)(iv) Defendant was required to offer an alternative standard that made available the "full reward" to any participant who satisfied that standard but Defendant failed to make that available. By structuring and administering its program to provide only *prospective* relief, Defendant's program violates ERISA's wellness program rules and undermines the intent of the rules, which the Departments made clear is that "every individual participating in the program should be able to receive the full amount of any reward or incentive, regardless of how the individual qualifies for the reward." Final Regulations, 33160.

40. Defendant violates ERISA's notice requirements. To start, Defendant does not notify participants of a *reasonable* alternative standard to avoid the tobacco surcharge. While there is mention of an alternative standard, that standard is not reasonable because it does not make available the full reward. The notice requirement cannot be divorced from the "full reward" requirement because the statute, § 300gg-4(j)(3)(E), requires disclosure of the availability of a *reasonable* alternative standard, not just any pathway, but one that satisfies the statute's conditions, including subsection (D)'s "full reward" mandate.

40. Also, as shown above, there is no mention in the Guidebook, or anywhere else, of the required statement that participants' personal physician's recommendations will be accommodated in developing a reasonable alternative standard. That statement must appear in all Plan materials describing the program or referencing a premium differential (*see* 45 C.F.R. § 146.121(f)(4)(v); Final Regulations, 33166 ("a plan disclosure that references a premium differential based on tobacco use … is a disclosure describing the terms of a health-contingent

17

wellness program and, therefore, must include this disclosure"), but here they appear in none. The SPD, which is supposed to contain complete Plan terms, says nothing at all about the tobacco surcharge. The absence of any reference to the surcharge in the SPD, coupled with the lack of a required disclosure in *any* Plan materials renders the program noncompliant and violates ERISA's and the PHSA's wellness program rule.

41.     In addition to the tobacco surcharge, Defendant imposes a separate surcharge for unvaccinated employees, which also appears to operate as a health-contingent wellness program subject to the same regulatory requirements. GardaWorld imposes a $100 monthly surcharge (roughly $46.15/biweekly) on plan participants who fail to show proof of COVID-19 vaccination. Defendant does not disclose any reasonable alternative standard for participants to avoid the vaccine surcharge or any accommodation process based on physician recommendations, medical contraindications, or personal circumstances. Nor does it provide notice, in any Plan materials, that such accommodations are available. Accordingly, the vaccine surcharge is similarly unlawful and discriminatory under ERISA and the PHSA.

42.     Taken together, Defendant's surcharge programs are structured and administered as punitive premium differentials that (i) withhold retroactive, make-whole relief for participants who complete a reasonable alternative later in the year, (ii) fail to disclose, in any Plan materials, the required information about physician-directed accommodations and instructions for accessing them, and (iii) apply additional surcharges to unvaccinated participants without disclosing any reasonable alternative standard or process for avoiding the surcharge. Federal law requires that "every individual participating in the program should be able to receive the full amount of any reward or incentive," without diminution based on when or how the alternative standard is

satisfied. Defendant's practice of granting only prospective relief and omitting critical information on participants' rights cannot be squared with those requirements.

43.     Defendant should have made available a wellness program that ensure that all participants who satisfied an alternative standard received "the same, full reward" as non-tobacco-using participants. Defendant should have notified participants of a *reasonable* alternative standard that made available the "full reward" to "all similarly situated individuals." Defendant should not have withheld from its Plan communications the clear and explicit disclosures required by law. Had GardaWorld included that information in all Plan materials discussing the surcharge and premium differential, participants like Plaintiffs would have known and could have taken steps to avoid or recover the surcharges. However, Defendant's deficient notices left participants, including Plaintiffs, unaware of all the avenues to available to them to avoid the surcharges.

44.     Because Defendant cannot satisfy the regulatory criteria that "must be satisfied" to qualify for the statutory safe harbor for health-contingent wellness programs, its tobacco and vaccine surcharges are discriminatory under ERISA. The complete absence of information in the SPD and the incomplete statements in the Guidebooks violated ERISA's disclosure rules and deprived participants of the information necessary to exercise their rights.

## III.     DEFENDANT'S SELF-DEALING AND MISMANAGEMENT OF PLAN FUNDS

45.     GardaWorld administered and collected the tobacco surcharge through its payroll system by designating which participants would be charged and withholding the surcharge directly from participants' wages on a before-tax basis, alongside required employee premium deductions. Participants' paystubs show the tobacco surcharge deducted on a pre-tax basis using the same payroll deduction and tax treatment as employee contributions (e.g., line item "Tobacco Charge"

and "HDHP Prem Med."), confirming that GardaWorld treated the surcharge as part of the Plan's contribution rate structure rather than an after-the-fact employer fee. The following is from a participant's paystub showing the surcharge deduced pre-tax in the same stream as employee contributions:

**Pre-Tax Deductions**
401K Pre Tax
Basic Dental
HDHP Prem Med
Tobacco Charge
Vision Premium

46.     GardaWorld's materials confirm that the tobacco surcharge is a participant contribution to the self-insured Plan. As shown above, the surcharge was withheld pre-tax in the same deduction stream used for employee medical contributions and was described to participants as part of the coverage contribution rate. The SPD confirms that participant contributions are applied first to Plan costs before employer dollars are applied. Accordingly, each surcharge dollar reduced GardaWorld's own required funding rather than serving as a third, additive funding stream for the Plan.

47.     The governing Plan documents establish that GardaWorld's group health benefits are funded by a combination of employer and participant contributions and further reflect the creation and maintenance of a funding vehicle for the payment of Plan benefits. Under ERISA, participant contributions withheld from wages are "plan assets" as of the earliest date they can reasonably be segregated from the employer's general assets and, in all events, no later than 90 days after collection. *See* 29 U.S.C. § 2510.3-102. Upon information and belief, surcharge amounts were deposited into GardaWorld's general operating accounts—generating float and earnings for

20

GardaWorld and depriving the Plan of investment income and reserves—and retained there for periods exceeding the earliest date they could be reasonably segregated for the Plan, and, in some instances, for more than 90 days after withholding. Because the Plan is self-insured and participant payments are collected through payroll, those participant contributions, including the surcharge amounts, are Plan assets as of the earliest date they can reasonably be segregated from employer assets and, in all events, not later than 90 days after collection. GardaWorld could not lawfully treat those participant-paid amounts as general employer revenues or use them to replace its own funding.

48.     On information and belief, GardaWorld did not transmit the tobacco-surcharge amounts to the Plan in full and instead used the surcharge stream to offset, dollar-for-dollar, its own obligation to fund the self-insured Plan. GardaWorld is explicit that it is self-insured and that "every dollar spent on medical costs is paid directly by the company[,]" and that the surcharge was imposed "to offset the rising medical costs due to the COVID pandemic."

The need for COVID-19 Vaccination

As a company, our medical plans are self-insured, which means every dollar spent on medical costs is paid directly by the company. Therefore, we have taken additional measures to promote a healthier work environment for all employees and address the increased medical costs due to the COVID pandemic, without increasing employee medical contribution premiums. To offset the rising medical costs due to the COVID pandemic, those employees participating in the company medical plan who have not been fully vaccinated will be subject to a monthly $100.00 surcharge.

49.     The SPD likewise states that, for self-insured benefits, the Company uses employee and employer contributions to pay benefits directly from the Company's general assets. It further provides an ordering rule requiring that "[a]ll participant contributions will be applied first to cover premiums or benefit costs" before any employer dollars are applied. As a result, every surcharge dollar withheld from participant pay reduced GardaWorld's own contribution obligation dollar-for-dollar.

21

### C. Ordering of Participant and Company Contributions

This section applies unless the plan sponsor has adopted specific written procedures or a document that specifies a different ordering for plan contributions or for plan receipts to plan contributions.

- All participant contributions will be applied first to cover premiums or benefit costs, and then Employer contributions will be applied to cover any remaining premiums or benefit costs plus the cost of other plan expenses, including stop-loss premiums if applicable.

50. In addition, the SPD provides that "[t]he Plan Administrator provides a schedule of the applicable premiums during open enrollment periods . . . ." Upon information and belief, the tobacco surcharge appears in that premium schedule, confirming that the surcharge is a participant premium contribution administered by the Plan, not a separate employer fee, and therefore must be applied and handled in accordance with Plan terms and ERISA's rules governing employee contributions." Because participant contributions are, by Plan design, applied first to Plan costs, the surcharge operated as a dollar-for-dollar displacement of the GardaWorld's Plan funding rather than an increase in Plan resources. That displacement produced an employer gain (i.e., reduced cash outlays and float) and a Plan loss (i.e., lost employer contributions and earnings). Labeling the surcharge as a "premium" does not convert participant-paid amounts into employer funds. In a self-insured plan, participant contributions withheld from wages are Plan assets when reasonably segregable; they must be held for the exclusive purpose of paying Plan benefits and cannot be used to reduce the employer's funding obligation.

51. This conduct is self-dealing and a prohibited transaction under ERISA §§ 404 and 406. By diverting participant contributions and using them to reduce its own funding obligation to the self-insured Plan, GardaWorld dealt with Plan assets for its own account. The tobacco surcharge proceeds (i.e., participant contributions and therefore Plan assets upon withholding) were not preserved for the exclusive purpose of paying benefits but were used to improve

GardaWorld's own financial position by reducing its cash contributions, increasing its short-term liquidity, and capturing float and interest on participant-paid surcharges. This contravenes the SPD's "exclusive benefit" mandate that all Plan assets be used solely for participants and beneficiaries and to defray reasonable plan expenses. In so doing, GardaWorld failed to act solely in the interests of participants and beneficiaries and violated the duties of loyalty and prudence and ERISA's prohibited transaction rules.

52.     Consistent with the SPD's "exclusive benefit" rule and ERISA's fiduciary duties, withheld surcharge amounts should have been promptly segregated from GardaWorld's general assets and deposited into the Plan's designated claim-funding account or trust for the exclusive purpose of paying benefits and reasonable Plan expenses. These amounts should have been held in a segregated account as Plan assets, not used to offset GardaWorld's employer funding obligations.

53.     Independently, GardaWorld breached its fiduciary duties by designing and administering the surcharges in a manner that withheld the "full reward" from similarly situated individuals, limited relief to purely prospective removal of the tobacco surcharge, and omitted in Plan-facing materials the required disclosures that a *reasonable* alternative standard was available and that a participant's personal physician's recommendations would be accommodated. The Guidebooks—which are the materials participants actually rely on—state "there will be no refunds of any surcharges that have been assessed," provide no clear contact information or mechanism to access a reasonable alternative standard, and omit any statement that personal physician recommendations will be honored. These noncompliant program terms and omissions were implemented through Plan administration and communications, misled participants about their

23

ERISA rights, and further demonstrate GardaWorld's failure to act in accordance with Plan documents and applicable law.

54.     In short, GardaWorld treated participant-paid tobacco surcharges as an employer offset rather than as Plan contributions. Under the SPD's ordering rule, participant dollars are applied first to pay Plan costs, so every surcharge dollar necessarily reduced the employer's required contributions to the Plan. The Plan was thereby deprived of the employer funding and earnings it otherwise would have received, while GardaWorld captured the financial benefit of those participant contributions through reduced cash outlays, increased liquidity, and float. These Plan-wide losses and corresponding employer gains are cognizable under ERISA § 502(a)(2) and establish violations of ERISA §§ 404 and 406.

## CLASS DEFINITION AND ALLEGATIONS

55.     Plaintiffs bring this action individually and on behalf of all other similarly situated individuals, pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure.

56.     Plaintiffs propose the following Class definitions, subject to amendment as appropriate:

> **Nicotine Surcharge Class** (the "**Nicotine Class**")
> All individuals residing in the U.S. who, from 2014 to the time of judgment, paid a tobacco surcharge in connection with their participation in a health or welfare plan offered by GardaWorld.

> **Vaccine Surcharge Class** (the "**Vaccine Class**")
> All individuals residing in the U.S. who, from 2020 to the time of judgment, paid a Covid/Vaccine surcharge in connection with their participation in a health or welfare plan offered by GardaWorld.

57.     Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers and directors, and judicial officers and their immediate family members and associated court staff assigned to this case.

24

58.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate.

59.     The proposed Classes meet the criteria for certification under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3).

60.     **Numerosity**. This action is appropriately suited for a class action. The members of the Classes are so numerous that the joinder of all members is impracticable. Plaintiffs are informed, believe, and thereon allege, that the proposed Classes contain hundreds of participants who have been damaged by Defendant's conduct as alleged herein, the identity of whom is within the knowledge of Defendant and can be easily determined through Defendant's records.

61.     **Commonality**. This action involves questions of law and fact common to the Classes. The common legal and factual questions include, but are not limited to, the following:

   a. Whether Defendant's vaccine surcharge discriminates against participants based on a health status related factor;

   b. Whether Defendant's tobacco surcharge discriminates against participants based on a health status related factor;

   c. Whether the smoking cessation program offered by Defendant to participants constitutes a reasonable alternative standard by which a participant could receive the "full reward";

   d. Whether Defendant notified participants in all the Plan materials that mention the tobacco surcharge of an alternative standard by which participants could avoid the tobacco surcharge and obtain the "full reward";

   e. Whether Defendant notified participants of the availability of reasonable alternative standard to avoid the Covid surcharge and whether Defendant provided the required contact information or a statement that participants' personal physicians' recommendations would be accommodated;

   f. Whether Defendant's wellness programs for unvaccinated participants and tobacco users violated ERISA and the applicable regulations;

   g. Whether Defendant breached its fiduciary duties by collecting and retaining the vaccine and tobacco surcharges;

h.   Whether Defendant breached its fiduciary duties by failing to periodically review the terms of its wellness programs to ensure compliance with ERISA and applicable regulations; and

i.   The appropriate mechanisms to determine damages on a class-wide basis for the Classes.

62.   **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Class, because, *inter alia*, all Class members have been injured through the uniform misconduct described above and were charged improper and unlawful tobacco surcharge. Moreover, Plaintiffs' claims are typical of the Class members' claims because Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class. In addition, Plaintiffs are entitled to relief under the same causes of action and upon the same facts as the other members of the proposed Class.

63.   **Adequacy of Representation**. Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs and members of the Classes each participated in health and welfare plans offered by Defendant and were harmed by Defendant's misconduct in that they were assessed unfair and discriminatory nicotine and vaccine surcharges. Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have retained competent counsel experienced in complex litigation and class action litigation. Plaintiffs have no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiffs.

64.   **Superiority**. A class action is superior to other methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would be virtually impossible for a member of the Classes, on an individual basis, to obtain effective redress for the wrongs done to him or her. Further, even if the Class members could afford such individualized litigation, the court

26

system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no management difficulties under the circumstances here.

65.     Plaintiffs seek injunctive, declaratory, and equitable relief on grounds generally applicable to the Classes. Unless the Classes are certified, Defendant will be allowed to profit from its unfair and discriminatory practices, while Plaintiffs and the members of the Classes will have suffered damages. Unless Class-wide injunctions are issued, Defendant may continue to benefit from the violations alleged, and the members of the Classes will continue to be unfairly treated.

## CAUSES OF ACTION

### COUNT I
### UNLAWFUL SURCHARGE – FAILURE TO PROVIDE THE FULL REWARD UNDER THE TOBACCO SURCHARGE
**(Violation of ERISA § 702, 29 U.S.C. § 1182(b) and PHSA 2705, 42 U.S.C. § 300gg-4(j)(3)(D); 29 C.F.R. § 2590.702(f)(4)(iv); 45 C.F.R. § 146.121(f)(4)(iv))**

66.     Plaintiffs re-allege and incorporate herein by reference the prior allegations in paragraphs 1–65 of this Complaint.

67.     Defendant unlawfully impose a tobacco surcharge on all participants who use tobacco in violation of ERISA § 702. By imposing discriminatory surcharges of $100 monthly on participants who use tobacco, without complying with the regulatory requirements, Defendant is violating ERISA § 702(b), 29 U.S.C. § 1182(b)(1). This discrimination stems from Defendant's decision not to provide a *reasonable* alternative standard that makes available to all participants

who satisfy an alternative standard the "full reward," in violation of ERISA and the Final Regulations.

68.     ERISA explicitly prohibits group health plans from requiring "any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor." *See* 29 U.S.C. § 1182(b). Defendant's Plan violates this prohibition because it fails to offer a *reasonable* alternative standard because it ties the value of what participants receive to the time he or she completes the program, in violation of 42 U.S.C. § 300gg-4(j)(3)(D) and 45 C.F.R. § 146.121(f)(4)(iv).

69.     Defendant fails to provide all participants who satisfy the reasonable alternative standard with the full reward required by law. Rather than granting the complete removal or equivalent credit of the tobacco surcharge upon completion of the alternative, Defendant provides only *prospective* relief to participants who complete the program. In several instances, Defendant affirmatively states that "there will be no refunds of any surcharges that have been assessed," contradicting the full-reward requirement. Participants who complete the very same alternative later in the Plan year receive fewer benefits than those who complete the same identical standard earlier in the year. This results in unequal treatment of similarly situated individuals who, within the same Plan year, meet the same standard yet receive different financial outcomes solely due to when they complete the cessation program. While an employer may design reasonable procedures for accessing an alternative standard, it may not refuse to provide the "full reward" or erect timing conditions that diminish the value of the reward for one participant versus another who completes the same standard in the same Plan year. By refusing to reimburse participants who satisfy the alternative standard, Defendant's program operates as an impermissible partial refund scheme.

70.     By law, "the same, full reward" must be provided regardless of when a participant satisfies the alternative, which renders previously collected surcharges for that plan year subject to an equitable obligation to return once the participant completes the alternative. Defendant's policy of refusing refunds is *per se* inconsistent with this rule. Because participants who satisfy the alternative standard are not provided with the full reward for the entire Plan year upon completion, Defendant's practice of making prospective-only adjustments violates the full reward rule and, consequently, makes the surcharge itself discriminatory and unlawful.

71.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." 29 U.S.C. § 1182(b) is a provision of ERISA that Plaintiffs and members of the Classes may enforce pursuant to 29 U.S.C. § 1132(a)(3).

72.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek all available and appropriate remedies to redress violations of ERISA's anti-discrimination provisions outlined in § 1182(b), including but not limited to the relief set forth below in the Prayer for Relief.

### COUNT II
### UNLAWFUL SURCHARGE – FAILURE TO PROVIDE THE FULL REWARD UNDER THE COVID SURCHARGE
### (Violation of ERISA § 702, 29 U.S.C. § 1182(b) and PHSA 2705, 42 U.S.C. § 300gg-4(j)(3)(D); 29 C.F.R. § 2590.702(f)(4)(iv); 45 C.F.R. § 146.121(f)(4)(iv))

73.     Plaintiffs re-allege and incorporate herein by reference the prior allegations in paragraphs 1–65 of this Complaint.

74. GardaWorld improperly imposes a Covid surcharge on all participants who fail to show they are fully vaccinated against COVID-19, without offering a reasonable alternative standard, in violation of ERISA § 702 and PHSA § 2705.

75. Because the Covid surcharge is an outcome-based wellness program, and Defendant fail to make available an alternative standard that would allow participants an avenue to avoid the surcharge, there is no mechanism to make available the full reward, as required by law. Defendant's own materials tie the amount of surcharge relief to the date within the Plan year that a participant satisfies the initial standard (i.e., by becoming fully vaccinated), rather than offering participants an alternative to getting vaccinated. Participants who do get vaccinated mid-year receive only partial relief, even though they met the identical standard and incurred the same surcharge prior to completion. This type of design and administration results in disparate treatment among similarly situated individuals based solely on when the person satisfies the standard.

76. By limiting relief to prospective adjustments or partial credits and refusing to make participants whole for the period within the same Plan year after they satisfy the initial standard, Defendant fails to deliver the full reward for the COVID surcharge. This violates the full-reward requirement and renders the COVID surcharge program discriminatory. As with the tobacco surcharge, Defendant's approach functions as an unlawful partial refund policy that deprives participants who meet the standard of the full value of the reward they are owed for the Plan year.

77. By law, "the same, full reward" must be provided regardless of when a participant satisfies the alternative, which renders previously collected surcharges for that plan year subject to an equitable obligation to return once the participant completes the alternative. Defendant's policy of refusing refunds is *per se* inconsistent with this rule. Because participants who got vaccinated mid-year are not provided with the full reward for the entire Plan year, Defendant's

30

practice of making prospective-only adjustments violates the full reward rule and, consequently, makes the surcharge itself discriminatory and unlawful.

78.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." 29 U.S.C. § 1182(b) is a provision of ERISA that Plaintiffs and members of the Classes may enforce pursuant to 29 U.S.C. § 1132(a)(3).

79.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek all available and appropriate remedies to redress violations of ERISA's anti-discrimination provisions outlined in § 1182(b), including but not limited to the relief set forth below in the Prayer for Relief.

### COUNT III
### UNLAWFUL SURCHARGE – FAILURE TO PROVIDE REQUIRED NOTICE
**(Violation of ERISA § 702, 29 U.S.C. § 1182(b) and PHSA § 2705, 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v); 45 C.F.R. § 146.121(f)(4)(v))**

80.     Plaintiffs re-allege and incorporate herein by reference the prior allegations in paragraphs 1–64 of this Complaint.

81.     Defendant failed to provide participants with the required notices of the availability of a *reasonable* alternative standard in communications describing both the tobacco surcharge and the COVID surcharge. The Final Regulations require that every Plan communication describing the availability of a reward or the imposition of a surcharge must disclose that a reasonable alternative standard is available (or that the standard will be waived), provide contact information for how to qualify for the alternative, and state that the recommendation of a participant's personal physician will be accommodated. 45 C.F.R. § 146.121(f)(4)(v). The alternative standard Defendant

disclosed with respect to the tobacco surcharge was not reasonable because it did not make available the full reward, as required. Further, the Guidebooks are Plan materials describing the wellness program and discussing the premium differentials, which must contain the physician accommodation statement and contact information, did not contain proper notice.

82.     Participants classified as "tobacco users" or "unvaccinated" were automatically placed into the surcharge category and subjected to ongoing payroll deductions without notice explaining the steps to take to avoid the surcharge through an alternative standard or the right to have a personal physician's recommendations accommodated in that process. By omitting these notices from the SPD and other participant-facing communications that employees actually rely upon when enrolling, Defendant violated the wellness-program notice requirements and ERISA's disclosure obligations. These notice failures rendered both surcharge programs noncompliant and, as a result, discriminatory and unenforceable.

83.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." 29 U.S.C. § 1182(b) is a provision of ERISA that Plaintiffs and members of the Classes may enforce pursuant to 29 U.S.C. § 1132(a)(3).

84.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek all available and appropriate remedies to redress violations of ERISA's anti-discrimination provisions outlined in § 1182(b), including but not limited to the relief set forth below in the Prayer for Relief.

85.     29 U.S.C. § 1182(b) prohibits group health plans from requiring "any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or

32

contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." Because the Plan imposes a discriminatory surcharge on unvaccinated participants, without providing the proper notice to participants, including failing to notify participants of the availability of a reasonable alternative standard, the contact information for obtaining or accessing the reasonable alternative standard, or a statement that recommendations of participants' individual physicians would be accommodated, Defendant's wellness program violates the DOL Regulations and is discriminatory in violation of ERISA. Further, Defendant failed to include the requisite notice in either the plan document or the SPD in violation of the DOL Regulations.

86.     Participants, including Plaintiffs were unable to request a reasonable alternative standard with respect to the vaccine surcharge because the Plan failed to provide the required notice of its availability. Specifically, the Plan materials, including the Benefit Guides, did not adequately disclose the existence of a reasonable alternative standard or the process for obtaining one, as required under federal regulations. Without this critical information, Plaintiffs and similarly situated individuals were deprived of the opportunity to request an alternative standard, effectively barring them from qualifying for the reward and rendering the vaccine surcharge unlawful under applicable ERISA and wellness program regulations. Further, Because the tobacco surcharge is a term of the Plan's premium schedule, the SPD should have contained notice describing the availability of reasonable alternative standards and physician accommodations but notice was omitted altogether from the SPD.

87.     Defendant's imposition of the vaccine surcharge is a violation of ERISA § 702 and the applicable regulations thereunder, including but not limited to 29 C.F.R. § 2590.702(f).

88.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." 29 U.S.C. § 1182(b) is a provision of ERISA that Plaintiffs and Class members may enforce pursuant to 29 U.S.C. § 1132(a)(3).

89.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek all available and appropriate remedies to redress violations of ERISA's anti-discrimination provisions outlined in § 1182(b), including but not limited to the relief set forth below in the Prayer for Relief.

## COUNT IV
### BREACH OF FIDUCIARY DUTY (PLAN-LEVEL RELIEF, ERISA § 502(a)(2))
### (Violation of ERISA §§ 404, 406 and 409, 29 U.S.C. §§ 1104, 1106 and 1109)

90.     Plaintiffs re-allege and incorporate herein by reference allegations 1–65 of this Complaint.

91.     At all relevant times, GardaWorld was the administrator of the Plan and was a fiduciary in that it exercised discretionary authority and control over the management of the Plan's assets.

92.     ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1); 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye

single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

93.     Instead of loyally and prudently acting in the best interests of Plan participants, Defendant chose, upon information and belief, to use Plan assets to exclusively benefit itself, to the detriment of the Plan and its participants, by unlawfully withholding millions of dollars in tobacco surcharges from participants' paychecks and using these funds to offset its own obligations to contribute to the Plan. The paystubs confirm that these surcharges were collected as before-tax deductions, alongside other contributions to the Plan, and thus were Plan assets from the moment of collection. Defendant breached its fiduciary duty by assessing and collecting the tobacco surcharge in violation of federal law and in violation of the terms of the Plan and then diverting those funds to reduce its own costs. The Plan should have received three funding streams: (1) employee premium contributions, (2) GardaWorld's contribution amount, and (3) the surcharge itself. But Defendant used the surcharge amounts to displace its own contributions. Upon information and belief, GardaWorld further profited by retaining those amounts in its own accounts, earning a float, and failing to remit the full employer contribution owed to the Plan.

94.     Year after year, Defendant administered the Plan within the meaning of 29 U.S.C. § 1002(16) and was a fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21), in that it exercised discretionary authority and discretionary control respecting the management and administration of the Plan and its surcharge programs, including the decision not to offer compliant wellness programs. Defendant exercised discretionary authority by deciding how surcharge proceeds were handled, funneling the surcharge funds indirectly into its own coffers. Defendant also controlled whether participants would receive the "full reward" of avoiding the surcharge for

35

the Plan year and failed to administer notices or alternatives required by ERISA's implementing regulations.

95. Upon information and belief, Defendant controlled and disseminated to all employees the Guidebooks and other Plan communications discussing the premium differentials but failed to provide necessary contact information or notify them of all the ways by which they could avoid the entire year of surcharges. GardaWorld further failed to conduct periodic or prudent reviews of its surcharges and wellness programs (or lack thereof), and the related communications, to ensure compliance with ERISA and its regulations. Instead, it administered a structurally defective wellness program, year after year.

96. GardaWorld breached its fiduciary duties by administering a Plan that did not conform with ERISA's anti-discrimination requirements. It acted disloyally by using ill-gotten funds to shrink its own financial contributions. It also failed to properly notify participants, year after year, of compliant wellness programs and failed to review the terms of the Plan to ensure compliance. These breaches are incompatible with ERISA's core fiduciary mandates.

97. As a result of the unlawful surcharges, GardaWorld enriched itself at the expense of the Plan. By deducting these amounts directly from participants' paychecks without properly administering a compliant wellness program, GardaWorld secured financial savings for itself while participants and the Plan bore increased costs. The structure of the program ensured that "all similarly situated individuals" could not obtain the "full reward" for the entire plan year, and Defendant's deficient communications failed to notify participants of how to access a reasonable alternative standard. In this way, Defendant minimized the chances of participants taking action to avoid the surcharges and transformed what should have been an employer-funded wellness program into an unjust enrichment for itself, contrary to 29 U.S.C. § 1104(a)(1)(A).

36

98. Further, by withholding unlawful surcharges from participants' paychecks and using those funds to reduce its own financial obligations to the Plan, Defendant caused the Plan to engage in transactions that constituted a direct or indirect exchange of Plan assets for the benefit of a party in interest—namely, itself—in violation of 29 U.S.C. § 1106(a)(1). GardaWorld is a party in interest, as defined under 29 U.S.C. § 1002(14), because it is both the Plan sponsor and a fiduciary exercising discretionary authority over the Plan's assets.

99. By retaining the amounts of the tobacco surcharges, GardaWorld increased its own corporate assets and saved the money it would otherwise have had to contribute to the Plan. In doing so, it dealt with Plan assets for its own benefit, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), which prohibits fiduciaries from engaging in self-dealing. The surcharges should have supplemented, not displaced, GardaWorld's contributions. By retaining and misusing the surcharges, upon information and belief, GardaWorld benefitted from the float at the expense of the Plan and its participants, leaving the Plan with less than what it should have received under its governing documents.

100. The Plan suffered direct financial losses as a result of Defendant's imposition of the surcharges through a noncompliant wellness program. These surcharges—collected as increased premium contributions—were used by Defendant to fund Plan operations, including payment of claims and administrative expenses, and thus enriched Defendant at the expense of the Plan because Defendant should have been making its contributions *in addition* to the surcharge funds. These amounts represent Plan-level losses because they reflect unlawful contributions used by Defendants to offset their own contributions to the Plan. In other words, the Plan would have had more money in it if Defendant had made its agreed-upon contributions along with the funds generated by the surcharge.

101.     Defendant breached its fiduciary duties by: administering a noncompliant Plan; failing to make available the "full reward" to participants; failing to provide the "full reward" to those who satisfied alternative standards; failed to make available an alternative standard to those participants paying the Covid surcharge; failed to properly disclose material information about the wellness programs to participants—specifically, the right to include their own physician in the development of an alternative standard—thereby depriving them of the ability to make informed choices; acting on behalf of a party whose interests were adverse to the Plan and its participants, in violation of ERISA § 406(b)(2); and failing to prudently review the terms of the Plan, the surcharges, the wellness programs, and the communications sent to participants, for years, to ensure compliance with ERISA's requirements. These breaches caused Plaintiffs and the Class to incur unlawful surcharges that shifted costs to participants and away from GardaWorld. Had Defendant complied with its fiduciary duties, it would have noticed its deficiencies and taken steps to ensure participants had access to compliant alternative standards and the information they needed on their rights to avoid the surcharges.

102.     As a direct and proximate result of these fiduciary breaches, members of the Class lost millions of dollars in the form of unlawful surcharges that were deducted from their paychecks.

103.     Plaintiffs are authorized to bring this action on a representative basis on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2). Defendant is liable to: make good to the Plan all losses resulting from its breaches, as well as the profits realized by Defendants, including but not limited to any and all equitable and remedial relief as is proper, disgorge all unjust enrichment and ill-gotten profits, and to restore to the Plan or a constructive trust all profits acquired through its violations, as alleged herein.

104.    In the alternative, to the extent the Court determines that surcharge amounts were not Plan assets upon withholding, Plaintiffs seek equitable restitution in the form of a constructive trust or equitable lien over specifically identifiable funds that, in equity and good conscience, belong to participants. GardaWorld's retention and application of those encumbered funds to offset its own contributions constituted unjust enrichment remediable in equity.

## COUNT IV
## BREACH OF FIDUCIARY DUTY (INDIVIDUAL RELIEF, ERISA § 502(a)(3))
### (Violation of ERISA §§ 404, 406 and 409, 29 U.S.C. §§ 1104, 1106 and 1109)

105.    Plaintiffs re-allege and incorporate herein by reference allegations 1–65 of this Complaint.

106.    At all relevant times, GardaWorld was the administrator of the Plan and was a fiduciary in that it exercised discretionary authority and control over the management of the Plan's assets.

107.    ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1); 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

108.    Rather than acting solely for participants' benefit, GardaWorld administered a noncompliant wellness program that imposed unlawful surcharges, withheld millions of dollars directly from participants' paychecks, and failed to ensure that participants received the full reward guaranteed under 29 C.F.R. § 2590.702(f)(4)(iv). Through these acts, GardaWorld enriched itself

39

at participants' expense and deprived them of funds that should have remained in their possession or been offset through compliant premium adjustments.

109. Upon information and belief, GardaWorld designed, controlled, and disseminated the Guidebooks and other Plan communications describing the surcharges. Those materials omitted critical information about participants' rights, specifically, the contact information for accessing a reasonable alternative standard and their entitlement to accommodation of a personal physician's recommendations in developing an alternative standard. GardaWorld also failed to conduct prudent reviews of its surcharges and wellness program (and lack thereof), and Plan communications, to ensure ongoing compliance with ERISA and its implementing regulations.

110. By operating a wellness program that did not satisfy ERISA's nondiscrimination rules, GardaWorld acted disloyally and imprudently. It diverted participant funds for its own benefit, used those amounts to reduce its financial obligations to the Plan, and misled participants through incomplete or misleading communications. Each of these actions constituted self-dealing and a breach of GardaWorld's fiduciary duties under 29 U.S.C. §§ 1104(a)(1)(A)–(D) and 1106(b).

111. By retaining the proceeds of unlawful surcharges rather than returning them to participants or crediting them toward future coverage, GardaWorld increased its own corporate assets and engaged in transactions that constituted a direct or indirect transfer of plan-related assets for the benefit of a party in interest—namely, itself—in violation of 29 U.S.C. § 1106(a)(1).

112. Defendant breached its fiduciary duties by: administering a wellness program that discriminated on the basis of health status; failing to provide accurate and complete disclosures concerning participants' rights and obligations under the program, thereby depriving them of the ability to make informed choices; failing to prudently review and correct the program's structural defects despite repeated plan-year renewals; and acting in its own financial interest rather than in

40

the exclusive interest of participants and beneficiaries. These breaches caused Plaintiffs and the Class to incur unlawful surcharges that shifted costs to participants and away from GardaWorld. Had Defendant complied with its fiduciary duties, it would have noticed its deficiencies and taken steps to correct the behavior.

113.    As a direct and proximate result of these breaches, Plaintiffs and similarly situated participants suffered concrete monetary losses in the form of unlawful surcharges deducted from their wages, as well as the loss of their statutory right to equal and nondiscriminatory treatment under ERISA.

114.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs and the Class seek individual equitable relief necessary to redress Defendant's fiduciary breaches, including but not limited to restitution of all unlawfully withheld surcharges; imposition of a constructive trust or equitable lien over funds wrongfully retained by Defendant; disgorgement of profits obtained through use of those funds; a surcharge remedy to make participants whole; and declaratory and injunctive relief prohibiting Defendant from continuing to administer a noncompliant wellness program or collect unlawful surcharges in the future.

115.    In the alternative, to the extent the Court determines that surcharge amounts were not Plan assets upon withholding, Plaintiffs seek equitable restitution in the form of a constructive trust or equitable lien over specifically identifiable funds that, in equity and good conscience, belong to participants. GardaWorld's retention and application of those encumbered funds to offset its own contributions constituted unjust enrichment remediable in equity

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendant on all claims and requests that the Court awards the following relief:

A. An Order certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as Class representatives for the Classes, and appointing the undersigned to act as Class Counsel;

B. A declaratory judgment that the unlawful and discriminatory nicotine and vaccine surcharges imposed on participants violate ERISA's anti-discrimination provisions set forth in ERISA § 702, 29 U.S.C. § 1182;

C. An Order instructing Defendant to reimburse all persons who paid the unlawful and discriminatory surcharges;

D. A declaratory judgment that Defendant breached its fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, following terms of the Plan that violated ERISA's anti-discrimination provisions and for failing to adequately monitor and review the terms of the wellness programs to ensure they complied with ERISA;

E. An Order requiring Defendant to provide an accounting of all prior payments of the surcharges under the Plan;

F. Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendant from further violating the duties, responsibilities, and obligations imposed on it by ERISA with respect to the Plan and ordering Defendant remit all previously collected surcharges;

G. Disgorgement of any benefits or profits Defendant received or enjoyed due to the violations of ERISA § 702, 29 U.S.C. § 1182(b);

H. Restitution of all amounts Defendant charged for the surcharges;

I. Surcharge from Defendant totaling the amounts owed to participants and/or the amount of unjust enrichment obtained by Defendant as a result of its collection of the unlawful and discriminatory nicotine and vaccine surcharges;

J. Relief to the Plan from Defendant for its violations of ERISA § 404, 29 U.S.C. § 1104, under 29 U.S.C. § 1109, including a declaration that the tobacco and/or vaccine

surcharges are unlawful; restoration of losses to the Plan and its participants caused by Defendant's fiduciary violations; disgorgement of any benefits and profits Defendant received or enjoyed from the use of the Plan's assets or violations of ERISA; surcharge; payment to the Plan of the amounts owed to members who paid the surcharges; removal and replacement of the Plan's fiduciaries, and all appropriate injunctive relief, such as an Order requiring Defendant to stop imposing the unlawful and discriminatory surcharges on participants in the future.

K. Imposition of a constructive trust or equitable lien over surcharge proceeds retained by GardaWorld or used to reduce GardaWorld's Plan funding obligations, and disgorgement of float and earnings thereon.

L. Plan-level restoration equal to employer funding displaced by participant-paid surcharges, plus lost earnings, and individual restitution equal to unlawfully collected surcharges not returned as part of the "full reward;"

M. An award of pre-judgment interest on any amounts awarded to Plaintiffs and the Classes pursuant to law;

N. An award of Plaintiffs' attorneys' fees, expenses, and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

O. Any other relief the Court determines is just and proper.

Dated: February 24, 2026

Respectfully submitted,

**SIRI & GLIMSTAD LLP**


By: /s/ *Mason Barney*

Mason Barney
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (929) 220-2802
E: mbarney@sirillp.com

Oren Faircloth (*pro hac vice* to be filed)
William H. Payne (*pro hac vice* to be filed)
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: ofaircloth@sirillp.com
E: wpayne@sirillp.com

*Attorneys for Plaintiffs and the Proposed Classes*